UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

COMMETIC MUELLER,

              Plaintiff,

      v.                              Case No. 19-CV-1091

ANDREW M. SAUL,
Commissioner of the Social Security Administration,

              Defendant.

## DECISION AND ORDER

### 1. Introduction

Plaintiff Commetic Mueller alleges she has been disabled since June 5, 2015 (Tr. 13) and therefore seeks a period of disability and disability insurance benefits. After her application was denied initially (Tr. 67-86, 112-28) and upon reconsideration (Tr. 87-108, 129-47), a hearing was held before an administrative law judge (ALJ) on April 10, 2018 (Tr. 41-64). On May 29, 2018, the ALJ issued a written decision concluding that Mueller was not disabled. (Tr. 13-31.) After the Appeals Council denied Mueller's request for review on July 16, 2019 (Tr. 1-4) she filed this action (ECF No. 1). All parties have

consented to the full jurisdiction of a magistrate judge (ECF Nos. 9, 10) and this matter is ready for resolution.

**2. ALJ's Decision**

In determining whether a person is disabled an ALJ applies a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ determines whether the claimant has engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). The ALJ found that Mueller "has not engaged in substantial gainful activity since June 5, 2015, the alleged onset date[.]" (Tr. 15.)

The analysis then proceeds to the second step, which is a consideration of whether the claimant has a medically determinable impairment or combination of impairments that is "severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), (c). An impairment is severe if it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1522(a). The ALJ concluded that Mueller has the following severe impairments: "Crohn's disease with small fiber polyneuropathy, mild degenerative joint disease of the right hip with suspected anterior labral tear and impingement, history of non-epileptic pseudoseizures, major depressive disorder, anxiety disorder, attention deficit disorder, and post-traumatic stress disorder[.]" (Tr. 15.)

At step three the ALJ is to determine whether the claimant's impairment or combination of impairments is of a severity to meet or medically equal the criteria of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (called "the listings"), 20

C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. If the impairment or impairments meets or medically equals the criteria of a listing and also meets the twelve-month durational requirement, 20 C.F.R. § 404.1509, the claimant is disabled. 20 C.F.R. § 404.1520(d). If the claimant's impairment or impairments is not of a severity to meet or medically equal the criteria set forth in a listing, the analysis proceeds to the next step. 20 C.F.R. § 404.1520(e). The ALJ found that Mueller "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1[.]" (Tr. 17.)

In between steps three and four the ALJ must determine the claimant's residual functional capacity (RFC), which is the most the claimant can do despite her impairments. 20 C.F.R. § 404.1545(a)(1). In making the RFC finding the ALJ must consider all of the claimant's impairments, including impairments that are not severe. 20 C.F.R. § 404.1545(a)(2). In other words, "[t]he RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p. The ALJ concluded that Mueller has the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except [Mueller] can only occasionally perform tasks requiring feeling with the bilateral upper extremities. She cannot work around hazards, such as unprotected heights or moving machinery. [Mueller] would require ready access to a restroom. In addition she can (on a sustained basis) understand, remember, and carry out simple instructions, but should not work at a production rate or pace. [Mueller] can use judgment in making simple work-related decisions, respond appropriately to supervision, coworkers, and usual work situations in work environments and when performing tasks requiring only occasional and superficial interactions with the public and coworkers, as

well as occasional interactions with supervisors. [Mueller] can deal with changes in a routine work setting, as long as they are infrequent (one to two times per week) and introduced gradually.

(Tr. 20.)

After determining the claimant's RFC, the ALJ at step four must determine whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560. The ALJ concluded that Mueller "has no past relevant work[.]" (Tr. 30.)

The last step of the sequential evaluation process requires the ALJ to determine whether the claimant is able to do any other work, considering her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c). At this step, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that [Mueller] can perform[.]" (Tr. 30.) In reaching that conclusion, the ALJ relied on testimony from a vocational expert (VE), who testified that a hypothetical individual of Mueller's RFC, age, education, and work experience could perform the requirements of packer, mail clerk, and office clerk. (*Id.*) After finding Mueller could perform work in the national economy, the ALJ concluded that she was not disabled. (Tr. 31.)

### 3. Standard of Review

The court's role in reviewing an ALJ's decision is limited. It must "uphold an ALJ's final decision if the correct legal standards were applied and supported with substantial evidence." *L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1152 (7th Cir. 2019) (citing 42 U.S.C.

§ 405(g)); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017) (quoting *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010)). "The court is not to 'reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner.'" *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). "Where substantial evidence supports the ALJ's disability determination, [the court] must affirm the [ALJ's] decision even if 'reasonable minds could differ concerning whether [the claimant] is disabled.'" *L.D.R. by Wagner*, 920 F.3d at 1152 (quoting *Elder*, 529 F.3d at 413).

4. **Analysis**

Mueller argues that the ALJ erred (1) by not accounting in the RFC for her need for unscheduled work breaks; (2) in evaluating her statements regarding the limiting effects and intensity of her symptoms; and (3) by giving "little" or "minimal" weight to the opinions of her treating medical providers. (ECF No. 13 at 8.)

   **4.1. Unscheduled Work Breaks in the RFC**

Mueller argues that the ALJ erred by not including in the RFC a limitation supported by the record—namely, her need to take unscheduled work breaks. (ECF No. 13 at 9-12.)

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).

Mueller argues that, because of her "bathroom urgency, frequency, and incontinence," she will require more unscheduled breaks than normally allowed during an eight-hour workday. (ECF No. 13 at 12.) She argues that the following evidence from the record supports this limitation:

- In May 2014, Dr. Mazumdar notes ten bloody diarrhea stools per day[;]
- Episodes of bloody diarrhea and abdominal cramping/constant and severe abdominal pain continues to be documented throughout 2014[;]
- In May 2015, Dr. Perera notes Mueller is having twenty to thirty loose bowel movements per day with associated urgency, incontinence, and abdominal pain[;]
- Despite Remicade treatments, mid-2015 treatment notes indicate approximately seven bowel movements per day with continuing urgency and incontinence[;]
- In November 2105, Dr. Perera notes that Mueller is having five to six bowel movements per day with fecal incontinence, which occurs without warning[;]
- About a week later, Mueller again presents to urgent care with abdominal pain, vomiting, and diarrhea (too many episodes to count); as well as incontinence[;]
- December 2015 treatment notes indicate continued fecal incontinence with nine to eleven bowel movements per day[;]
- Mid-2016 treatment notes indicate difficulty functioning, easy fatigue, and continued abdominal pain, frequent bowel movements with associated urgency, and nausea/vomiting despite medication adjustments and changes[;]
- September 2016: five to six episodes of diarrhea with mucus … has urgency and incontinence once per week[;]
- November 2016: five bowel movements per day; incontinence once per week[;]

- February 2017: persistent diarrhea; four to five bowel movements per day; incontinence once per week; still with urgency[;]
- March 2017: over ten bowel movements per day, liquid and more mucous [sic] towards end of day; incontinence twice per week; urgency noted[;]
- May 2017: more than one to three bowel movements per day[;]
- May 2017: twelve bowel movements per day[;]
- October 2017: having six to eight bowel movements per day; urgency; had incontinence at work two days ago[;]
- December 2017: six bowel movements per day, incontinence once every two days, urgency[.]

(ECF No. 13 at 10-11 (internal citations omitted).) Mueller argues that, even though the RFC assessment includes a limitation for ready access to a restroom, the ALJ did not include a limitation that would allow her to take "bathroom breaks beyond what could be accommodated by regularly-scheduled breaks." (ECF No. 13 at 12.) And she argues that this omission is critical because of the VE's testimony that a single unscheduled work break would preclude her from performing the jobs noted at step five. (*Id.*)

In response the Commissioner does not explicitly address this issue. Instead, the Commissioner argues that, "in light of the ALJ's reasonable weighing of [Mueller's] subjective complaints and the opinion evidence, substantial evidence supports the ALJ's RFC finding.… [Mueller] can hardly blame the ALJ for ensuring that [she] had ready access to a restroom while working." (ECF No. 18 at 15.)

During the hearing the ALJ first asked the VE about a hypothetical individual who "would require access to a restroom and would need to take one unscheduled bathroom break per day in addition to normally scheduled breaks and the bathroom break would

last approximately five minutes." (Tr. 61.) In response the VE stated "that the additional break on an unscheduled basis in additional [sic] to the other breaks would classify any work that she did as accommodated," so no jobs "in the competitive, unskilled market" would be available. (Tr. 61-62.) When the ALJ removed the accommodation for unscheduled breaks, the VE found three jobs that would be available. (Tr. 62.)

Ready access to a bathroom refers to "proximity to a bathroom," *Brueggen v. Barnhart*, No. 06-C-0154-C, 2006 WL 5999614, at *1, 6 (W.D. Wis. Dec. 15, 2006), whereas a need to take a break to go to the bathroom means that an individual will "be away from her work station," *id.* at *6. *See Van Meter v. Astrue*, No. 09 C 3013, 2010 WL 5232931, at *5 (N.D. Ill. Dec. 16, 2010) ("The ALJ asked the VE to consider an individual who also needs ready access to a bathroom, such that he would 'probably have to be indoors.'"); *Rajski v. Colvin*, No. 3:14-CV-1477-TLS, 2015 WL 5730102, at *4 (N.D. Ind. Sept. 30, 2015) ("defin[ing] ready access to bathrooms as being able to reach the bathroom within three minutes"). Given the distinction, providing an accommodation of "ready access to a restroom" does not accommodate an individual who must frequently stop working — take one or more unscheduled breaks — in order to use the restroom.

The court agrees with Mueller that it was error for the ALJ to omit from the RFC assessment her need to take unscheduled bathroom breaks. Accordingly, on remand the ALJ should make a finding as to whether Mueller requires at least one unscheduled work break each day to use the restroom and, if so, either include in the RFC assessment her

need for such a break or provide a good reason supported by substantial evidence for omitting such a limitation.

**4.2. Credibility Determination**

In making his RFC determination the ALJ must engage in a two-step process to evaluate a claimant's symptoms. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, 2017 WL 5180304, at *3. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the ALJ] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities.…" *Id.* The ALJ's evaluation of a claimant's symptoms is entitled to "special deference" and will not be overturned unless it is "patently wrong." *Summers*, 864 F.3d at 528 (citing *Eichstadt v. Astrue*, 534 F.3d 663, 667-68 (7th Cir. 2008)).

"An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, 'functional limitations,' and treatment (including medication)." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). "[A]n ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his

conclusion." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)); *see* SSR 16-3p, 2017 WL 5180304, at *10 ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

The ALJ found Mueller's statements concerning the intensity, persistence, and limiting effects of her conditions to be inconsistent with other evidence in the record. (Tr. 21.) The ALJ then summarized examination findings from June 2016 through January 2018 (Tr. 21-23) and concluded,

> In sum, despite the impairments of Crohn's disease with small fiber polyneuropathy, mild degenerative joint disease of the right hip with suspected anterior labral tear and impingement, and history of non-epileptic pseudoseizures, the medical evidence of record does not support the notion that these impairments and symptoms would preclude [Mueller] from engaging in light work, as articulated by the above residual functional capacity. The undersigned also considered [Mueller's] allegations with regard to side effects from her medications and incorporated limitations resulting from those side effects into the above residual functional capacity assessment, to the extent the allegations were supported by the medical evidence of record.

(Tr. 24 (internal citations omitted).) The ALJ also considered her activities of daily living and found that "[Mueller] has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations." (Tr. 27.)

10

Mueller argues that the ALJ cherry picked the record, and that her Crohn's disease symptoms, like urgency and frequency of bathroom visits, are not likely to appear during a short doctor's visit, so "the ALJ's general reliance on [her] being neurologically intact with a normal heart rate does little to support his conclusion …." (ECF No. 13 at 13.) She again provides an extensive list of evidence that the ALJ did not cite that is inconsistent with the ALJ's conclusion about the limiting effects of her Crohn's disease. (*Id.* at 13-16.) Mueller also argues that the ALJ misconstrues her activities of daily living by citing documents that contain evidence of impairments, including frequent bathroom visits, struggles with focus, completing chores at a slow pace because she needs to take breaks, and daily two-hour naps. (*Id.* at 17.) And even though she worked as a dog handler in the past, the ALJ does not discuss the extensive performance issues noted by her employer. (*Id.*)

In response the Commissioner argues that "the ALJ reasonably determined that a medical provider would have observed [Mueller] in some distress if she had accurately testified about needing to the use the restroom 10 times a day, 5 times a week." (ECF No. 18 at 7.) And the Commissioner argues that the ALJ explained and cited medical evidence that was inconsistent with Mueller's purported need to use the restroom with such frequency. (*Id.* at 7-8.) In terms of her activities of daily living, the Commissioner argues that they "reasonably conflict[]" with Mueller's claim that she needed to frequently use the restroom. (*Id.* at 8.) And the ALJ did not cherry pick the record but rather discussed

11

only the most pertinent evidence. (*Id.* at 8-9.) Finally, Mueller never explained how a poor performance evaluation at her dog handler position corresponded to a disability. (*Id.* at 10.)

Although Mueller has pointed to evidence that supports her claims, the ALJ's credibility determination was not "patently wrong." The ALJ went through examination findings from August 2015 through January 2018 and described findings at each exam. Though most of the descriptions focus on "normal" examination findings, the ALJ did mention findings that may support Mueller's claim as to the limiting effects of her impairments, such as that "a November 2015 colonoscopy showed active duodenitis, chronic active ileitis, and chronic active right-sided colitis" (but treated) (Tr. 22), "a January 2017 colonoscopy showed generally normal findings, with mild ileitis and an anal fissure" (Tr. 23), and "pain and decreased [right hip] strength with resisted hip flexion and abduction" (*id.*). As noted above, the ALJ stated that he also considered side effects from Mueller's medications and her activities of daily living. And the ALJ talked with Mueller at the hearing about her restroom use, incontinence, and side effects from her medication. (Tr. 54-55.) Given the ALJ's consideration of all of this evidence, it cannot be said that the ALJ's credibility determination was "patently wrong." *See Prochaska*, 454 F.3d at 738.

Mueller argues that the ALJ's credibility determination was significant because she had testified about needing a minimum of one unscheduled work break. (ECF No. 13 at

18.) The court has already found that the ALJ is to make a specific finding about this on remand. If the ALJ finds that Mueller does require such a break, the ALJ is to include the limitation in the RFC or provide a good reason for not doing so. As such, the ALJ's credibility determination does not warrant remand.

### 4.3. Opinion Evidence

Finally, Mueller argues that the ALJ erred by assigning only "little" or "minimal" weight to the opinions of her treating providers. (ECF No. 13 at 18-23.) She specifically argues that the ALJ should have given more weight to the opinions of Dr. Malini Mehta, Dr. Lilani Perera, and Nurse Practitioner Basil Maduka. (*Id.*)

"For claims filed before March 2017, a treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well-supported by medical findings and consistent with substantial evidence in the record." *Johnson v. Berryhill*, 745 F. App'x 247, 250 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(c)(2); *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016)). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion" to determine how much weight to give the opinion. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, (7th Cir. 2008); *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)).

While "[a]n ALJ must offer good reasons for discounting a treating physician's opinion," *Campbell*, 627 F.3d at 306 (internal quotations and citation omitted), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (quoting *Luster v. Astrue*, 358 F. App'x 738, 740 (7th Cir. 2010)). And, generally, "more weight [is given] to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

The ALJ gave little weight to the opinions of Mueller's primary care physician, Dr. Mehta, and Dr. Perera, her gastrointestinal specialist, explaining:

> The undersigned also assigns little weight to the opinions of Drs. Malini Mehta and Lilani Perna [sic]. In March 2016, Dr. Mehta assessed [Mueller's] physical capacity. She opined that [Mueller] is significant [sic] limited in a variety of work-related physical activities. Dr. Mehta also found that [Mueller] would miss two workdays per month, due to her impairments and resulting symptoms.
>
> In May 2015, Dr. Perna [sic] evaluated [Mueller's] physical capacity, concerning her Crohn's disease. She opined that [Mueller] is significantly limited in a variety of work-related physical activities. Dr. Perna [sic] also concluded that [Mueller] is likely to be absent from work four days per month. Despite their treating statuses, the undersigned finds that Drs. Mehta's and Perna's [sic] opinions are inconsistent with the record as a whole.
>
> As discussed above, examination findings reveal that [Mueller] was consistently observed as well developed, well nourished, and not in acute distress. She also steadfastly exhibited a heart with a normal rate and regular rhythm, with no murmurs, gallops, or rubs, no respiratory distress, with normal breath sounds, no rales or wheezing, no abdominal

> hepatosplenomegaly, masses, or distention, and normal bowel sounds, despite instances of periumbilical tenderness and objective medical evidence demonstrated signs of Crohn's disease. Moreover, [Mueller] often showed full muscle strength and normal musculoskeletal range of motion. As a result, Drs. Mehta's and Perna's [sic] opinions contrast sharply with and are without substantial support from the other evidence of record, which render them less persuasive. Thus, the undersigned concludes that the opinions of Drs. Mehta and Perna [sic] merit little weight.

(Tr. 25 (internal citations omitted).) Mueller argues that the ALJ erred by focusing on her normal examination findings and that "he grossly misconstrues and cherry-picks the Record." (ECF No. 13 at 20.)

Mueller also argues that the ALJ improperly discounted the opinion of Basil Maduka, D.N.P., who made findings related to her affective disorders. (ECF No. 13 at 20-23.) Although a nurse practitioner is not an "acceptable medical source," the factors in 20 C.F.R. § 404.1527(c) are also used to evaluate the opinions from non-acceptable medical sources. 20 C.F.R. § 404.1527(f)(1); *see* SSR 06-03p. "[E]vidence from 'other sources' … must be considered because such evidence can establish the severity of an impairment and its effects on the claimant's ability to function." *Pfeiffer v. Astrue*, 576 F. Supp. 2d 956, 963 (W.D. Wis. 2008) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p).

In January 2018 Maduka filled out a form entitled, "Mental Impairment Medical Source Statement." (Tr. 1373-77.) The ALJ described his findings and discounted the opinion, explaining:

> [Mr. Maduka] opined that [Mueller] is significantly limited in a variety of work-related mental activities. Mr. Maduka also found that [Mueller] would need four to five unscheduled breaks per workday and miss more

> than four workdays per month, due to her impairments and resulting symptoms. Moreover, he concluded that [Mueller] would be off task more than 30 percent of the workday, need an unusual level of supervision more than three times per workday, and would only efficiently perform full-time work on a sustained basis less than 50 percent of the workday. Despite his examining status, the undersigned finds that Mr. Maduka's opinion is inconsistent with the record as a whole.
>
> As discussed above, examination findings reveal that [Mueller] was frequently described as casually attired, alert, and fully oriented. She also consistently exhibited good eye contact, logical and clear thought processes, no delusions or hallucinations, good insight and judgment, intact memory and cognition, a neutral and congruent affect, and no suicidal or homicidal ideations. As a result, Mr. Maduka's opinion contrasts sharply with and is without substantial support from the other evidence of record, including his own observations and [Mueller's] activities of daily living, which rendered it less persuasive. Thus, the undersigned concludes that Mr. Maduka's opinion merits minimal weight.

(Tr. 29 (internal citations omitted).)

Mueller again provides extensive examples from the record of evidence that the ALJ failed to cite to and that are inconsistent with his conclusions, including reported depression, occasional suicidal ideation, anxiety, feelings of hopelessness, and fatigue. (ECF No. 13 at 21-22.) The ALJ did not address this evidence or explain why he discounted it.

The ALJ tended to focus on Mueller's normal findings at her exams and ignored findings that suggest a disability. And many of the findings that suggest a disability in the record may support the opinions of Dr. Mehta, Dr. Perera, and Maduka. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a

16
Case 2:19-cv-01091-WED   Filed 07/20/20   Page 16 of 17   Document 20

disability finding." *Denton*, 596 F.3d at 425 (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). And in discounting the opinions of her treating providers, the ALJ must examine the factors listed in the regulations, 20 C.F.R. § 404.1527(c)(2). The ALJ failed to do so here, ignoring important factors such as the frequency and length of time Dr. Mehta treated Mueller and the fact that Dr. Perera is a gastrointestinal specialist. Because the ALJ did not discuss findings that would lend credibility to the opinions of Mueller's treating providers, it cannot be said that his conclusion is supported by substantial evidence.

Accordingly, on remand the ALJ shall reevaluate the opinions of Dr. Mehta, Dr. Perera, and Maduka in light of all of the relevant evidence in the record. If the ALJ decides that Drs. Mehta and Perera's opinions are not entitled to controlling weight or that Maduka's opinion should be discounted, he shall provide good reasons supported by substantial evidence.

**IT IS THEREFORE ORDERED** that the Commissioner's decision is **reversed**, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is **remanded** for further rulings consistent with this decision. The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 20th day of July, 2020.

WILLIAM E. DUFFIN
U.S. Magistrate Judge